Okay, so our last case of the day is United States v. Boler, and Mr. Thompson, whenever you're ready. May it please the court. My name is Jeremy Thompson, and I represent Maggie Boler. No ordinary speaker of the English language would understand the phrase, if the law succeeded $6,500, to mean if the defendant intended but did not succeed to inflict loss exceeding $6,500. Common sense tells us this. Dictionaries tell us this. Canons of construction tell us this. Kaiser tells us this. This court should conclude that the plain text of 2B.1.1.B.1 does not include intended loss. A couple of months ago, I believe it was Michael Dreeben at the Supreme Court had back-to-back oral arguments, and I believe he got up by saying at the outset of his second argument, I don't want to pretend like I wasn't just present for the previous argument, so I will do the same. I understand this court obviously just heard argument regarding intended loss in the Friedka case. To answer your question, Judge Thacker, about what is our best case as to whether intended loss should, whether loss is unambiguous, the answer to that is Banks. That is the Third Circuit's published decision saying that loss unambiguously means actual loss, not intended loss, at least as it pertains to basic economic offenses of which this is one. With regard to this circuit, this court's decision in Campbell is obviously very favorable because it says that Kaiser applies. But this court has gone beyond that and applied Kaiser in several other cases, in particular regarding immigration cases. Your Honor, I would cite Romero v. Barr, which is 937 F. 3rd. 282. That's a 2019 decision from this court. Gonzalez v. Garland, 16 Fed. 4th. 131, a 2021 decision. And I'm probably going to butcher this, Mejia-Velasquez v. Garland, 26 Fed. 4th. 193, that's a 2022 decision. In each of those cases, this court struck down interpretations that had been given either by the Attorney General's office or that had been given by the Board of Immigration Appeals, which had purported to interpret certain portions of the CFR. And what this court did in Campbell and what this court did in those decisions is the court looked to the text of the regulation at issue and determined that it was unambiguous. This court and both the government, my friend on the other side in this case as well in the previous case, talked about the structure, history, and purpose of the guidelines. And I will address those, but this court did not go into any of those considerations in any of those cases. Instead, they concluded that the text of the regulation at issue was clear and the analysis stopped there. Counsel, you talked about Campbell and you talked about Kaiser. And this question I'm asking is not to suggest Campbell doesn't take priority over the Moses case that came later. But would your argument apply in the same way under Stinson that it's inconsistent or plainly erroneous under Stinson? We have not made that argument. I didn't understand that. I asked you would it. To the extent there's some issue about whether Campbell or Moses, at some point we may have to resolve that. Maybe this is the case we have to resolve that. But I wonder if under Stinson the same argument you're making wouldn't apply equally to the issue of whether it was plainly erroneous or inconsistent under Stinson. I certainly believe that it could, Your Honor. Stinson talks about, as does Campbell, there being a conflict between the text of the guideline and the commentary. And here you have the text of the guideline is unambiguous. It means actual loss. And the text of the guideline expands that to say you look not just to the actual amount lost but to what the defendant subjectively intended the victims lose. And especially when you look at it in the context of other provisions within the guidelines which have the text accounting for the defendant's intent for specific offense characteristics or for cross-references, the fact that they decided to put that information, that language, in the commentary puts it in conflict with the actual text of the guideline. It's completely inconsistent with the way the rest of the guidelines read. And so I think absolutely you can make the argument, and this Court can find under Stinson, if this Court decides we don't need to decide between Campbell or Moses. We're just going to apply Stinson. This Court can apply Stinson and find that... Or that it doesn't matter. Yes, that it does not matter. It does not matter which one this Court applies that under Stinson or Kaiser, which is what this Court did in Campbell. Under Kaiser or Stinson, the regulation is unambiguous. It means actual amount lost. I did want to address a couple of points that were, again, that were made a little bit earlier. And this goes, again, to the meaning of the word lost. You know, counsel for the government argued that the Yankees losing to the Red Sox, I may have gotten the example wrong, it might be vice versa, means that it was an intended loss. That's not actually what that means. It means that you hope that they lose. It means that they actually lost. Every example that was used in our case from the briefing from our side, from the government side, and from the briefing for the Friedka case, every definition means actual loss. No party has ever come up with a definition of loss that would include intended loss. And I think that just makes it abundantly clear that loss means actual, tangible loss. And again, especially in context, loss exceeding $6,500 requires a look at the amount of money that was lost. If you had a conversation with somebody and you said, hey, I lost, I had a loss exceeding $6,500. And they said, how much did you lose? And you said $0. Right? They'd look at you like you were crazy. Because you wouldn't say my loss exceeded $6,500 to mean that I lost no money. You would only say it if you actually lost money. In what role, if any, does Section 1B1.3, which requires the sentencing court to consider all intended harm, play into the analysis? 1B1.3 You're probably going to say it doesn't. Well, I'm not going to say that it doesn't. What I say is that 1B1.3 has a couple of considerations that do not convert the text of 2B1.1 or other similarly worded phrases to require a look into the harm, the object of the harm, in all circumstances. To determine all specific offense characteristics or cross-references or base offense levels. And so 1B1.3 begins by saying unless otherwise indicated. Now, at no point in time in the guidelines does, do the guidelines say ignore 1B1.3. Right? So that phrase only has meaning in the event that there's some context in the text of the guideline that would direct you to ignore those provisions. If you look to the Sixth Circuit Smith decision, we submit that its interpretation of 1B1.3 would introduce both superfluousness throughout the guidelines as well as conflicts with how the guidelines have traditionally been interpreted. So with regard to superfluousness, the guidelines include a defendant's intent in the text of the guidelines repeatedly. There are, and I have the, forgive me, I have the citations, but there are, including in 2B1.1B14, the government actually, not the government, the Sentencing Commission actually uses the word intended. Right? And what the defendant intended to occur. If 1B1.3A3 applied in every circumstance, that language is superfluous. Right? Because you would be looking at the defendant's intent regardless. And specifically it reads, if the offense involved misappropriation of a trade secret and the defendant knew or intended that the trade secret would be transported or transmitted out of the United States increased by two levels, or that the offense would benefit a foreign government, foreign instrumentality, or foreign agent increased by four levels. The language of the defendant knew or intended, right, is superfluous if Smith's reading of 1B1.3 is correct. Similarly, there are cross-references, so 2D1.1D2 has a cross-reference if you committed a crime of violence or intended to commit a crime of violence in committing a drug offense. That language is superfluous because if you would already include the defendant's intent in determining whether the cross-reference applied under 1B1.3. And there are similar examples in 2G3.1 and I believe 2.2 which talk about sex offenders and child pornography and what the defendant intended to do and whether the defendant intended to distribute the pornography if the defendant intended to give the pornography to a minor. Those again, those are superfluous and this happens repeatedly throughout the guidelines. Similarly, on the flip side is where, and it's not just this court, and there are several examples listed in the brief, but this court and several other courts have looked to language which requires a look back, a factual inquiry as 2B1.1B1 does into harm that was caused as a result of the offense to determine a specific offense characteristic. And those decisions have disregarded the defendant's intent because what you're looking for is whether the harm actually occurred. And so those decisions which did not look to a defendant's intent and did not consider it would be wrong under the interpretation of 1B1.3 as outlined in Smith. I understand you say that's wrong. How should we properly interpret that provision? I think this court should look at the guidelines and say 1B1.3 says here's a baseline rule for how you were supposed to interpret and apply the guidelines. And then when you get to the guideline itself, it's going to tell you what you need to do. So it tells you either to look to the defendant's intent or it tells you to look and see whether the harm actually occurred. And so it is a... Why does that not make it some, you're using superfluous, make some good arguments about that reading it the way Smith reads it would create superfluousness in other provisions. Why doesn't your reading create, make that provision itself effectively superfluous? Because what 1B1.3 is attempting, what 1B1.3A3 is doing is telling you the extent of the harm to look at when you're applying the guideline. So when you get to a guideline that says if the loss exceeded $6,500, you determine how much it exceeded $6,500. And you look at the scope of the crime as outlined in 1B1.3A1, A2, and then A3 and even A4. And you look to everything that was the harm caused or the object of the harm caused as it relates to whether the loss exceeded $6,500. When it tells you if the offense, and for B14, if the offense involved misappropriation of a trade secret and the defendant knew or intended, then you look at the object and how far the harm went for the defendant's intent. It's telling you how to apply the guidelines, not introducing additional considerations to be taken into account for every single one of the guidelines. It's not saying you go through each individual guideline and you put in the defendant's intent. It's saying when you get to this guideline, you look to see what it's asking for, and then this limits the range of it. That's essentially what it's doing. And I see I am out of time, so I will reserve the remainder of my time on rebuttal. All right. Thank you, Mr. Pearson. You have your argument. Thank you, Your Honors. Dwayne Pearson for the United States. I'm here with Katie Stoughton at counsel table. The district court did not err in applying the definitions of loss appearing in the commentary to 2B1.1. Kaiser instructs the court to look at the whole structure of the guidelines, and this results in the conclusion that the term loss is ambiguous. The 6th Circuit in both you and Smith have addressed this issue head on and found that the 1st Circuit in Gadsden and Limbaugh and the 11th in the Verdeza case have found that it is not plain error to use intended loss. Only the 3rd Circuit in the Banks decision has disagreed. Now, I do believe the parties agree that we rely upon the tools of general, excuse me, the general tools of construction to interpret the guidelines in this way as instructed by Kaiser. And to do so, we must look at the text, the structure, the purpose, and the history. Even under Kaiser's less deferential approach, we should still come to the conclusion that loss does, in fact, mean both actual or intended. Specifically, Your Honors... Because it's the government's position that it's ambiguous, so we then need to look to the commentary? Yes, Your Honor. What if we find that it is not ambiguous? Can you still prevail? Yes, Your Honor. And how is that? If the court were to decide that it is unambiguous, the government would argue that intended loss is part of the normal definition of loss. And despite what my good friend on the other side says, there are circumstances where individuals use loss to mean intended. For instance, if I were to tell you I purchased a stock for $100 on Monday, that stock went down in value to $80 on Tuesday. On Tuesday, I would tell you I had a loss of $20. And that is because it is unrealized. It is something that could happen, and if I intend to realize that loss on Tuesday because I must make this sale, then I am going to take that loss. But I am clearly talking about a speculative intent in that situation. Similarly... Is that right? Are we using intent in a different place then? In that hypothetical, at the time, you have an actual loss. Now, it may not be realized until you act on it, but that seems different than saying that the loss itself is what you intended but did not happen. Yes, Your Honor, but I would say intent in that. Obviously, when I purchased the stock, I intend for it to go higher. Right. So what I am pointing out is... You wouldn't say my intent was... I mean, to follow up on that, you probably would have thought it would have gone up to $2,000. Well, I can't remember what you said, but you said it went $1,000. You thought it might have doubled. Instead, it went down $100. You would not have said, well, I thought it was going to go up to $2,000, so I lost $1,020. You would say your loss was $20, which you actually paid versus what it was. Your intent that it was going to go up wouldn't have made any difference. Yes, Your Honor, but the intent, I believe in the normal conversation, which again is the basis of what we are talking about, really is subject to the time and place in which you ask the question about the loss. Specifically, if you ask that question on Tuesday, I would tell you I lost $20. Even though it is speculative, even though it hasn't happened, even though it was my intent to do something different, to be higher, if I don't make that decision on Tuesday, clearly it's going to change. But the point of the government's argument on this is that in the normal vernacular, when you're talking about loss, it is highly contingent upon exactly when you're talking about, the time frame that we're in. I'm sorry, I didn't mean to cut you off. No, no, go ahead. Is there a dictionary definition that encompasses intended loss? I do believe the government pointed out in its brief the failure to gain, which also we would argue a failure to gain seems to be similar to, if not identical to, an intended loss. What's a failure to gain? Give me an example of a failure to gain. A failure to gain would be, to keep it with a stock example, if I were offered an opportunity to buy futures, and I decided not to do that. And those futures then were worth millions and millions of dollars. In the normal vernacular, I would say, man, I lost millions of dollars in that decision because I failed to gain that. And I think I got you sidetracked on what is your primary argument by asking you if you could prevail even if we found that it was unambiguous. But your primary argument, I think, is that Campbell is president in this circuit, Kaiser applies, applying Kaiser, this is ambiguous, and so the commentary applies. Yes, Your Honor. Yes, Your Honor. Specifically, to talk about the structure of the guideline, although we are talking about the first couple of definitions in Part 3 of the commentary, I think it is important to note that that section is expansive and covers lots of questions about what loss means. Broadly, the entire section has to give varied definitions and clarifications about what we are supposed to include. And I would like to point out that even though it goes beyond the definition of actual versus intended, it also talks about whether or not loss, even actual loss, can be counted when a victim suffers a loss of penalties, interest, other fees that happen. I think that is important specifically in this case because as it is an IRS case, the victims in the case were certainly assessed penalties, interest, fines, fees, other actual losses that they are going to have to pay based on Ms. Bowler's actions in filing false tax returns on their behalf. I think that strengthens the government's argument that loss is in fact ambiguous because the only reason we wouldn't include those actual losses is because the commentary section of Part 3 instructs us not to. But that clearly seems to fit in what we would normally say is an actual loss. I say all that to point out that if we get into a Kaiser analysis and we start talking about the purpose and the structure specifically of the guidelines, it seems as though clearly loss is ambiguous. But if I'm understanding those examples, they are examples where what is actual losses, there's restrictions on what amounts to actual losses that are specifically provided in the guidelines. How does that suggest that because there is some specific express limitation on what an actual loss is, we're going to include in loss something that was not a loss at all? Because the question is whether or not loss is ambiguous. And if something is unambiguous, there shouldn't be these questions about what is included at all. And taking my good friend's reading of this, that means we would not look to the commentary at all on any of these questions. That all of these credits against loss would no longer apply. That all of these exclusions for things like penalties and interest would not apply because we would never ever get to the commentary to begin with. So maybe a fair point that the argument has potentially broad implications. Yes, sir. But if you had a definition of loss, let's say the guidelines said loss are actual losses and not intended losses and the commentaries come and reduce actual losses. And you had a definition, we'd be right at Campbell there, right? I mean, you wouldn't, even if it had broad implications, if they were in conflict with an express guidelines definition, that would be just the way the cookie crumbles, so to speak, right? Yes, your honor. And it is not our argument that it is the broad implications that turn it. It is our argument that the fact that there are all these questions about what loss means, means that loss is ambiguous. Let me just follow up. You know, I think it's interesting because in looking at the history of the guidelines, the commission and counsel on the other side pointed this out in a briefing in 1988. Actually, the language was in there. The language, I want to make sure I get it right, was estimated probable or intended loss. And they removed that language, but they left the language in the commentary. I'm just curious to see what your argument is, a response to that argument, I should say. Well, your honor, I would say that moving those things around in the commentary really just adds to the ambiguity of what loss means. The fact that we are here having these very highbrow discussions trying to come up with the definition, I think, lends us to believe that loss is in fact ambiguous. Clearly, throughout the history of this particular guideline, the courts have always interpreted intended loss to be part of the loss measure. I don't think anyone denies that. I do also believe that with the sentencing guideline obviously changing the guideline for clarification in the very near future would be indicative that they have meant and have always meant that intended loss is a part of what the court should look to in determining the proper sentencing guideline. If we are to go to the text specifically, starting in 1B.1.3, unless otherwise specified, the specific offense level shall be determined on the basis of the following. The generalized term loss in 2B.1.1 is not an other specification, as my good friend would say. In order to take that as an other specification, we would have to assume that loss meant actual loss and thus would be an other specification. It's circular logic that brings us back to the very argument that we have, what does it mean? If loss is ambiguous, then it is not an other specification that would render meaningless or that would invalidate the reading of 1B.1.3. Your Honor, we believe that the term loss certainly is not as limited as the other side would say, as the government has certainly given some examples and some argument as to why this term in the guideline is in fact ambiguous. We would certainly argue that as an ambiguous term, the district court did not err in using intended loss to calculate the guidelines and as such, we would ask that this court affirm the sentence. Your Honor, if you have no further questions. All right. We appreciate your argument. We will hear again from Mr. Thompson. Just briefly, to address a few points. One, this case is not presented on plain error, so Limbaugh and the First Circuit's decision, the Eleventh Circuit's decision, those cases were on plain error. So I don't think they have much to say on whether the issue presented, you know, the merits of the issue presented because they have explicitly said it's not, we're not compelled to find that actual loss, that loss does or does not include intended loss based on prior decisions. This issue is preserved. We made this objection before the district court. My friend just argued about some of the issues and some of the considerations in the commentary regarding actual loss versus credits against loss and things of that nature. Unfortunately, you can't use the commentary to find ambiguity in the text of the guideline, and that is what he is suggesting this court do. That is a mistake the Sixth Circuit made in you. You can't find, this court should not find, that any ambiguity created by the commentary makes the text of the guideline ambiguous. You have to look at the text of the guideline and determine whether that is ambiguous. And then you look to the commentary to determine whether the commentary is an appropriate interpretation of the text of the guideline, not the other way around. So we do not believe it's appropriate to look into those matters to find ambiguity. If in the future the government, if this court holds loss means actual loss in 2B1.1, the government is free to argue that actual loss then means what it means and that credits against loss and things of that nature are improper expansions of the clear term in 2B1.1. This is a two-way street. Kaiser cuts both ways. There are things in the guidelines that help defendants. There are things in the guidelines that help the government. Let me ask you about, because Kaiser says we have to look at the text, the structure, and the history, and then also the purpose. And there's this argument that the purpose is determined in the seriousness of the offense and that it's the culpability of the defendant, not the loss as to the victim. So how do you, I'm curious as to how do you, if we're looking at the guidelines, we're looking at the purpose of the guidelines and of this guideline, is that culpability on the defendant or do we consider the actual loss of the, or the loss of the victim? I think you are looking to the loss of the victim because that is what the guideline is instructing. The district court would be looking to the actual loss because that is what the guideline is instructing the court to do. So there's one defendant that sets out to defraud someone, let's say, of $150,000 and they're successful of it, and there's another defendant that sets out to defraud a victim of $150,000 and they're unsuccessful of it. How is one defendant less culpable than the other? In terms of loss? In terms of loss, one actually inflicted $150,000 in loss and the other one did not. As this court pointed out in Campbell, attempt crimes where defendants intended to inflict harm but did not succeed are generally thought to be less culpable than cases where a defendant actually completed the act. There could still be criminal liability for submitting false statements. I mean, here, your client was convicted of other crimes. It's just it may affect the enhancements. Yes. And nothing prohibits the court from considering the extent of the defendant's culpability in determining the ultimate sentence at the end of the day. If you have a case which is similar to what happened in banks where you have an extraordinary amount of intended loss and $0 in actual loss, that is something the court could consider in determining and fashioning the appropriate sentence at the end of the day. It would just be error to include it all in the loss calculation under 2B1.1. So I see that my time is up. We would just request that this court vacate the district court's judgment and remand for resentencing. All right. Thank you. I'll ask the clerk to adjourn court until tomorrow morning and we'll come down and greet counsel.
judges: Stephanie D. Thacker, A. Marvin Quattlebaum Jr., DeAndrea Gist Benjamin